

**SEALED**

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2010 JUL 28   AM 8: 53

DEPUTY CLERK ____ NT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| and | § | |
| | § | |
| | § | NO. _____ |
| SHAWN CLARK and JUAN A. DELGADO, | § | **3-10CV1478-K** |
| | § | |
| | § | **FILED UNDER SEAL** |
| QUI TAM RELATORS, | § | |
| | § | JURY REQUESTED |
| v. | § | |
| | § | |
| AMERICAN COMMERCIAL COLLEGES, INC. | § | |
| | § | |
| | § | |
| DEFENDANT. | § | |

## ORIGINAL FALSE CLAIMS ACT COMPLAINT

TO THE HONORABLE COURT:

   Shawn Clark and Juan A. Delgado complain of American Commercial Colleges, Inc., Defendant, as follows:

### I.   PRELIMINARY STATEMENT

   1.   This is a civil action for damages and civil penalties brought by Plaintiffs pursuant to 31 U.S.C. § 3729 et seq. pertaining to false and/or fraudulent claims which Defendant submitted or caused to be submitted to the United States Government. American Commercial College is a recipient of millions of dollars from the United States Department of Education, through the Higher Education Act ("HEA"). American Commercial College received, and is still receiving, these funds by falsifying records submitted to the federal government and misrepresenting its eligibility for Title IV funding.

## II.   PARTIES

### A.  Plaintiff

2.      Plaintiff is the United States of America on whose behalf Relators bring this action. The United States of America is here named a plaintiff because funds of the United States of America ("federal funds") were and are awarded to American Commercial College, pursuant to the HEA, Title IV, as a result of the false claims described in this Complaint.

### B.  Relators

3.      Relator Shawn Clark ("Clark") is a resident of Midland County, Texas.  He was employed as the Director of American Commercial College's Odessa, Texas campus from August 11, 2008 until March 30, 2010.

4.      Relator Juan Anthony Delgado ("Delgado") is a resident of Taylor County, Texas.  He was employed as the Director of American Commercial College's Abilene, Texas campus from August 18, 2002 until May 4, 2010.

5.      Relators have direct and independent knowledge of the allegations contained herein and are therefore considered "original sources" as so required under the Federal False Claims Act, 31 U.S.C. § 3729 et seq.  Relators have direct and personal knowledge of the fraud committed against the United States of America.

### C.  Defendant

6.      Defendant American Commercial Colleges, Inc. ("ACC") is a corporation that is organized under the laws of the State of Texas.  ACC's principal office is located in Lubbock, Texas.  ACC may be served with process by serving its registered agent for service of process, Brent Sheets, at 4412 74th Street, Suite E101, Lubbock, Texas 76424.

### III.   JURISDICTION

7.   This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3729 et seq. Further, this case arises from the wrongful conduct of Defendant incident to obtaining funds from the United States Department of Education pursuant to the Higher Education Act, Title IV.

8.   This Court has in personam jurisdiction over Defendant under 31 U.S.C. §3732(a), which authorizes nationwide service of process.

### IV.   VENUE

9.   Venue is proper in this district under 31 U.S.C. §3732(a), which provides that any action under this section may be brought in any judicial district in which any one defendant can be found, resides, transacts business, or in which any act proscribed by 31 U.S.C. §3729 et seq. occurred. Defendant's principal office is located in this District, Defendant transacts business in this District, and many of the violations of 31 U.S.C. §3729 described herein occurred within this District.

### V.   FACTS

#### A. Background

10.   ACC was founded in 1957. It is a privately-held proprietary college that awards career diplomas and industry certifications in various career fields, including the career fields of "Office Technology," "Computerized Accounting," "Information Technology," "Data Entry," "Medical Office Specialist," "Medical Assisting," "Medical Coding/Billing," and "Medical Transcriptionist." ACC operates campuses in Lubbock, Odessa, Abilene, Wichita Falls, San Angelo, and Shreveport.

11. Brent Sheets serves as the President of ACC, Elizabeth Sheets is ACC's Vice-President, and Brenda Richardson is the Secretary of the company.

12. Nearly 100 percent of ACC's students receive Title IV financial aid, in the form of Pell Grants and Stafford loans, to attend classes at ACC.

13. Stafford loans are a type of federal student loans that are provided by the United States Department of Education through the Federal Direct Student Loan Program. They are guaranteed by the federal government.

14. The Federal Pell Grant Program provides need-based grants to low-income students to promote access to postsecondary education. Unlike Stafford loans, Pell Grants do not need to be repaid.

15. ACC's students receive approximately $10.3 million in Title IV financial aid per year to pay ACC for their education.[1]

16. Of this figure, approximately $2.6 million of this annual revenue consists of Pell grants.[2]

---

[1] ACC's Lubbock campus enrolls approximately 250 students per year, and charges a minimum tuition of $10,180 per student. ACC's annual Title IV revenue attributable to its Lubbock campus is approximately $2.5 million. ACC's Abilene campus enrolls approximately 200 students per year, and charges a minimum tuition of $10,180 per student. ACC's annual Title IV revenue attributable to its Abilene campus is approximately $2 million. ACC's Odessa campus also enrolls approximately 200 students per year, and charges a minimum tuition of $10,180 per student. ACC's annual Title IV revenue attributable to its Odessa campus is approximately $2 million. ACC's San Angelo, Wichita Falls, and Shreveport campuses each enroll about 125 students per year, and charge a minimum tuition of $10,180 per student. ACC's annual Title IV revenue attributable to these three campuses is approximately $3.8 million.

[2] Approximately 75 percent of ACC's students receive Pell grants. The average Pell grant is $3,500.00. ACC's Lubbock campus enrolls approximately 250 students per year, of which approximately 187 receive Pell grants averaging $3,500 per student. Annual Pell grant revenue attributable to the Lubbock campus is approximately $654,000.00. ACC's Abilene campus enrolls approximately 200 students per year, of which approximately 150 receive Pell grants averaging $3,500 per student. Annual Pell grant revenue attributable to the Abilene campus is approximately $525,000.00 per year. ACC's Odessa campus enrolls approximately 200 students per year, of which approximately 150 receive Pell grants averaging $3,500 per student. Annual Pell grant revenue attributable to the Odessa campus is approximately $525,000.00 per year. ACC's San Angelo, Wichita Falls and Shreveport campuses each enroll approximately 125 students per year, of which approximately 93 receive Pell grants averaging $3,500 per student. Annual Pell grant revenue attributable to these campuses is approximately $976,500.00 per year.

ORIGINAL FALSE CLAIMS ACT COMPLAINT – PAGE 4

17. Upon information and belief, ACC's students have a default rate of approximately 15 percent. Thus, of the roughly $7.7 million of Stafford loan proceeds ACC receives per year, U.S. taxpayers ultimately foot the bill for $1.1 million.

18. These circumstances alone are problematic. But as set forth below, what makes this situation unconscionable is that ACC has not been eligible for one red cent of Title IV funds for many years.

### B. Violation of 90/10 Rule

19. Receipt of federal student financial aid pursuant to Title IV of the Higher Education Act (HEA; P.L. 89-329, as amended by P.L. 105-244) is contingent upon institutions of higher education meeting certain eligibility requirements.

20. One eligibility requirement imposed on proprietary colleges is that no more than 90 percent of their revenue can be derived from Title IV, HEA program funds. 34 CFR 600.5(a)(8). The purpose of this "90/10 Rule" is to restore some market incentive to education, as proprietary institutions are prevented from charging more that what students not receiving enough federal financial aid are willing to pay.

21. Proprietary schools gauge compliance with the 90/10 Rule by examining the revenues under the following formula for its latest complete fiscal year: Title IV, HEA program funds the institution used to satisfy its students' tuition, fees, and other institutional charges to students, divided by the sum of revenues generated by the school from (1) tuition, fees, and other institutional charges for students enrolled in eligible training programs, plus (2) school activities (to the extent not included in tuition, fees, and other institutional charges) necessary for the education or training of students enrolled in those eligible programs. 34 CFR 600.5(d)(1). The resulting figure should be 90 percent or less, and proprietary schools are required to disclose this figure as a footnote to its audited financial statement. 34 CFR 668.23(d)(4).

22.     If a proprietary college fails to satisfy the 90/10 Rule it must notify the Office of Financial Aid (FSA) at the U.S. Department of Education within 90 days after the end of its fiscal year. 34 CFR 600.5(f).

23.     The 90/10 rule was previously considered an institutional eligibility requirement, and failure to comply with the rule resulted in losing eligibility to participate in Title IV programs during the fiscal year following the year it failed to comply with the 90/10 Rule.   During the 2008 reauthorization process, however, the penalty for failure to meet the 90/10 Rule was revised so that a non-compliant institution's eligibility to participate in Title IV programs becomes provisional for the next two years.

24.     ACC's fiscal year runs from January 1 through December 31.

25.     Since the 2002 fiscal year ACC's Lubbock campus's reliance on Title IV funds has far exceeded 90 percent.   ACC's Abilene and San Angelo campuses have been similarly non-compliant since approximately 2004.

26.     ACC, however, has misrepresented its 90/10 compliance to the federal government by using a complicated and fraudulent scheme to mischaracterize a portion of each school's Title IV funds as non-Title IV funds.

27.     First, Angelyn Summers, ("Summers"), Defendant's Controller, identifies the extent to which each school exceeds 90 percent reliance on Title IV funds for that fiscal year and provides this information to Brent Sheets ("Sheets"), the President of ACC.   Sheets communicates this information to the directors of each school, and instructs each of them to solicit a certain number of students who have Title IV funds credited to their student accounts, who are then asked to execute a promissory note for a private loan issued by Texas Bank.   Typically each student is asked to apply for between $5,000 and $10,000 from Texas Bank.   The number of students asked

to execute promissory notes for these private loans depends upon how much "good money" the school needs to meet the 90/10 Rule. In fiscal year 2009, for example, ACC's Lubbock campus was over 100 percent reliant upon Title IV funds, and 53 students were asked to apply for private loans through Texas Bank. At ACC's Abilene campus 28 students were asked to apply for private loans. At its San Angelo campus, between 40 and 50 students were made to apply for a Texas Bank private loan.

28. To secure students' participation in this process, they are told that without their assistance the school would fail and the students' and their classmates' money and time would be wasted. They are also told that cooperating with this process would help the students' credit scores because their credit reports would reflect a loan that had been fully repaid. This is untrue, as the life of the loan is less than six months, so the loan is never actually reflected on the students' credit reports. Sheets instructs school directors to tell the students this even though he is aware that this is false.

29. Additionally, every student that obtains Title IV funding must pay ACC a "student responsibility" fee of $1,000.00. Students who still have a student responsibility fee outstanding by the time they are asked to apply for the Texas Bank loan are told that if they acquire the loan ACC will forgive the student responsibility fee.[3]

30. Texas Bank's Vice-President of Lending, David Peters, approves and processes these private loans with full knowledge of the unlawful purpose of these loans. When the loan checks are ready, Sheets and the other school directors travel to Texas Bank and pick them up. The school directors then meet with the students and the students assign the loan proceeds to the school.

---

[3] Incidentally, the student responsibility fee itself is another way ACC subverts the 90/10 Rule, counting these funds in the denominator of the 90/10 Rule calculation despite the federal origin of these funds.

31.     Simultaneously, the school directs NASAS, ACC's third party servicer, to refund the Title IV monies that had been credited to the students' accounts back to the Title IV lenders.

32.     ACC then recalculates the 90/10 figure with the Title IV monies replaced by the private loan proceeds.   ACC then lists the resulting figure in its financial statement, and represents to the federal government that the school is compliant with the 90/10 Rule.

33.     Shortly after the end of the fiscal year, ACC then directs NASAS to re-request the students' Title IV loans, and then repays the Texas Bank loans.

34.     Like Texas Bank, NASAS is complicit in this fraudulent scheme.

35.     ACC thus temporarily swaps the Title IV funds in order to create the appearance of compliance with the 90/10 Rule but in reality the school is 100 percent dependent upon Title IV funds, in gross violation of the 90/10 Rule.

36.     Had ACC not misrepresented that it was in compliance with the 90/10 Rule, ACC would have been ineligible for Title IV funds in fiscal years 2003, 2004, 2005, 2006, 2007, 2008, 2009 and 2010 at its Lubbock campus and fiscal years 2005, 2006, 2007, 2008, 2009, and 2010 at its Abilene and San Angelo campuses.   However, because it did misrepresent its eligibility for Title IV funds during these years, it unlawfully received the following amounts in Title IV funds, totaling approximately 39.2 million dollars:

| Campus | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Lubbock | 2.5 M | 2.5 M | 2.5 M | 2.5 M | 2.5 M | 2.5 M | 2.5 M | 2.5 M | 20 M |
| Abilene | N/A | N/A | 2 M | 2 M | 2 M | 2 M | 2 M | 2 M | 12 M |
| San Angelo | N/A | N/A | 1.2 M | 1.2 M | 1.2 M | 1.2 M | 1.2 M | 1.2 M | 7.2 M |
| Total | 2.5 M | 2.5 M | 5.7 M | 5.7 M | 5.7 M | 5.7 M | 5.7 M | 5.7 M | 39.2 M |

37.     Of this figure, approximately $10.3 million consists of Pell Grants funds.



### C. Misrepresenting employment rates to be eligible for state certification and Title IV funds

38. Schools receiving Title IV funds may not make false, erroneous, or misleading statements that the institution maintains a placement service for graduates or will otherwise secure or assist its graduates to obtain employment, unless it provides the student with a clear and accurate description of the extent and nature of this service or assistance. 34 CFR 668.74. Schools also may not make false, erroneous, or misleading statements concerning government job market statistics in relation to the potential placement of its graduates. Id.

39. The U.S. Secretary of Education may terminate an institution's participation in Title IV, HEA programs if the institution substantially misrepresents the employability of its graduates. 34 CFR 668.86.

40. "Misrepresentation" is defined as any false, erroneous, or misleading statement an eligible institution makes to a student enrolled at the institution to any prospective student, to the family of an enrolled or prospective student, or to the Secretary of Education. 34 CFR 668.71. "Substantial misrepresentation" is defined as any misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment. Id.

41. ACC routinely misrepresents the placement and employment rates of its graduates to prospective students. Sheets and other ACC administrators require the school directors and admissions staff to lie to students, and to simply "do whatever it takes" to enroll students.

42. School directors are expressly told that they would be terminated if they did not pressure, even lie to, students to get them to enroll at the school. Sheets was fond of saying "an enrollment a day keeps the owner away," meaning that he would terminate their employment if they did not do whatever it took to enroll students.

43.   Students considering enrolling at ACC are told affirmatively that ACC will get them a "good job" upon graduation.

44.   School officials were encouraged to tell prospective students that the school had a 90 percent placement rate, and indeed many students were given this misinformation.  Many were simply told that the school would place them in a position after completion of their studies. Many, like student M.M., were told that the placement rate was 85 percent.

45.   In reality, the placement rate is between 45 and 50 percent, and the employment rate is approximately 35 percent.[4]  These false statements, made to prospective students and sometimes their families, are misrepresentations within the meaning of 34 CFR 668.71.   Many students, such as M.M., were led to enroll at ACC because of these misrepresentations.   These misrepresentations are therefore also "substantial misrepresentations" within the meaning of 34 CFR 668.71.

46.   ACC not only misrepresented its job placement and employment rates to prospective students, but it also made similar representations to the Texas Workforce Commission for the purpose of maintaining its certificate to operate in Texas, thus ensuring a continuing stream of federal financial aid dollars.

47.   Proprietary schools are required to submit an "Annual Enrollment and Outcome Data Packet" to the Texas Workforce Commission every year in which they provide information about placement and employment rates of their graduates.  Proprietary schools must furnish to the Texas Workforce Commission the current rates of students who receive a certificate of completion and of job placement and employment of students issued a certificate of completion. Tex. Educ. Code § 132.055(b)(15).

---

[4] Placement rates are generally higher than employment rates because placement rates take into account fellowships and internships that have a finite duration, while employment rates reflect only those who receive and accept offers of open-ended employment.

48.   "Employment" is defined as "a graduating or graduate student's employment in the same or substantially similar occupation for which the student was trained." Tex. Admin. Code § 807.2(15).   "Job placement" is defined as "an affirmative effort by the school to assist the student in obtaining employment in the same or substantially similar stated occupation for which the student was trained." Tex. Admin. Code § 807.2(17).

49.   The State of Texas demands that proprietary colleges "demonstrate that a student who successfully completes the program is more likely to be employed in the stated occupation than an individual who does not complete the program, all other things being equal." Tex. Admin. Code § 807.124.   Chapter 807.131 of the Texas Administrative Code further provides that to maintain program approval, the school shall demonstrate "a minimum employment rate for program graduates in jobs related to the stated occupation." The State of Texas has fixed this minimum employment rate at 60 percent.

50.   If a school fails to meet the 60 percent employment rate for three consecutive years, the TWC may revoke the program's certification.

51.   ACC has falsified this portion of the Annual Enrollment and Outcome Data Packet since at least 2002.   While ACC has represented to the Texas Workforce Commission that its employment rate has met or exceeded 60 percent, ACC arrived at this figure by counting ineligible placements as "employment."

52.   For example, ACC mischaracterizes externship placements as "employment," even though those externships were usually unpaid.   Externships do not count toward an institution's "employment rate" because they are for a fixed timeframe and are considered part of the students' education.

53.   ACC also counts for its employment rate positions that are not "in the same or substantially similar occupation for which the student was trained."

54.   In addition, ACC counts for its employment rate positions that its students occupied prior to even attending school at ACC.

55.   To Relators' knowledge, ACC has never attained a 60 percent employment rate.   Had ACC not misrepresented its employment rates to the Texas Workforce Commission, the schools' certification would have been removed many years ago which would have prevented the schools from receiving Title IV funds since at least 2005.

### D.   "A Wink is as Good as a Nod" – Falsifying other Title IV documents

56.   Sheets directs the various school directors and other school personnel to forge and falsify documents in order to ensure continued receipt of Title IV funds.   As recently as November 2009, Sheets told school directors that when it comes to ensuring continued receipt of Title IV funds, "a wink is as good as a nod."

57.   Financial aid personnel are encouraged to forge missing student signatures to documents that are part of the Title IV loan and Pell grant process.   Essentially no conduct was off-limits when it came to securing Title IV funds.

58.   Unfortunately, over 50 percent of the individuals who enroll at ACC are interested not in furthering their education, but instead, obtaining the "expense check," an amount left over after Title IV loan proceeds and Pell grants are applied to their tuition.   All too often at ACC, students enroll, federal financial aid is obtained on their behalf by the school, the students receive their expense checks, and cease attending school after participating in only a handful of classes.   These students have no intention of repaying their Title IV loans, or at least recognize that they will not have to do so immediately.

59.    ACC does not view this as a problem.  In fact, the school benefits from this scheme. The school receives federal funds without having to deliver a service.  Rather than addressing this situation, the school actually enables it by forging and falsifying documents that are meant to prevent this very thing from happening.

### E.    Falsifying Leaves of Absence

60.    Title IV funds are awarded to a student (and paid to the school) under the assumption that the student will attend school for the entire period for which the assistance is awarded.  A student begins earning Title IV funds on the first day of attendance. Therefore if a student withdraws after the first day of attendance, the school must return a portion of the Title IV funds that were received but will never be earned. 34 CFR 668.22.  Up through the 60 percent point in each period of enrollment, a schedule is used to determine the amount of Title IV funds the student has earned at the time of withdrawal and therefore the amount of Title IV funds the school does not need to return.  *Id.*  For a student that withdraws after the 60 percent point in time, there are no unearned funds and the school is not required to return any portion of the Title IV funds. *Id.*

61.    A leave of absence ("LOA") is a temporary interruption in a student's program of study.  A student granted an LOA is not considered to have withdrawn, and a school need not return unearned Title IV funds. *Id.*  A LOA, however, must meet the requirements of 34 CFR 668.22(d), which include, among other requirements, that (1) the school have a formal policy regarding leaves of absence that includes a requirement that students provide a written, signed and dated request for the leave that identifies the reason for the request, (2) the student follows the school's policy in requesting the leave of absence, (3) the school determines that there is a reasonable expectation that the student will return to the school, (4) the school approved the

student's request in accordance with the school's policy, and (5) the number of days in the approved leave of absence does not exceed 180 days in any 12-month period.[5]

62.   If these requirements are not met the absence is considered a withdrawal and the school must return all unearned Title IV funds.   Moreover, if a student overstays a leave of absence this is treated as a withdrawal and a return of Title IV funds is required.   34 CFR 668.22.

63.   When faced with a student that signs up for class, obtains Title IV funds, and then stops attending class prior to completing 60 percent of a program, ACC often falsifies a Leave of Absence form, forges the student's signature to the form, and keeps the unearned Title IV funds.

64.   For example, in May 2010, student M.L. enrolled in classes, attended a few, and then disappeared.   Later she approached the school about obtaining her expense check.   Michelle Bares, the Student Coordinator at the Abilene campus, backdated a leave of absence to falsify dates that M.L. supposedly attended school, forged Delgado's signature to the form, gave M.L. the expense check, and ACC kept the Title IV proceeds.

### F.   Falsifying Last Date of Attendance at an Academically Related Activity

65.   ACC is not required to take attendance as a condition of eligibility for Title IV funds.

66.   Schools that are not required to take attendance may use a student's last date of attendance at an "academically related activity" to determine a student's withdrawal date.   34 CFR 668.22(c)(3).

---

[5] Texas law provides additional requirements with respect to leaves of absence.   Chapter 807.245(b) of the Texas Administrative Code provides that a school director may grant a student a leave of absence only after determining that good cause is shown.   Additionally, in a 12-month calendar period, a student may have no more than two leaves of absence.   TEX. ADMIN. CODE § 807.245(c).   For programs with course time of more than 200 hours, like the programs offered by ACC, a student may be on leave of absence for no more than 60 calendar days.   *Id.*   Significantly, schools must maintain attendance records that clearly define the dates of the leave of absence.   A written statement as to why the leave of absence was granted, signed by both the student and the school director indicating approval, must be placed in the student's permanent file.   TEX. ADMIN. CODE § 807.245(d).

67.    Thus, in situations where a student stops attending classes after Title IV funding has been received by ACC, the school is to determine the last date the student participated in an academically related activity, and this date is used to determine whether and to what extent the school must return that student's Title IV loan proceeds.

68.    Documentation of a student's attendance at an academically related activity must be provided by an official of the school. *Id.*

69.    School directors are required by Sheets to falsify these records as well, representing to the federal government that a student's last day fell after completing 60 percent of the program, when this is far from the truth. By doing so the school is released from its obligation to return the unearned Title IV proceeds.

70.    At the Odessa campus, administrators would obtain student signatures on Academically Related Activity forms during the first week of class. Afterwards students would stop attending class, and after the 60 percent point during the semester, the Student Coordinator of the campus would pledge the form and date it after the 60 percent point even though the student had not attended school since the first week of class.

### G.    Falsifying Satisfactory Academic Progress

71.    To be eligible for Title IV funds, a student must make satisfactory academic progress. 34 CFR 668.32(f).

72.    Accordingly, schools must establish and publish a "Satisfactory Academic Progress" policy that is used to measure students' academic progress. 34 CFR 668.16(e). A school's satisfactory academic progress policy must include a qualitative component consisting of grades (or comparable factors that are measurable against a norm). 34 CFR 668.16(e).

73.    ACC often arbitrarily assigns passing grades to students that have no relationship to their academic performance, or even any regard to whether the student even attends class.

Professors are directed to assign higher grades than are earned by students, simply to ensure students' continued eligibility for, and ACC's continued receipt of, Title IV funds.

74.    On one occasion, the network failed at ACC's Odessa campus and the grade records of students were lost.  Michael Otto, the Director of ACC's Lubbock campus, directed instructor Marisa Contreras to falsify grades for the fifteen students enrolled in a course she taught.  Otto told her to assign A's to the students she thought were probably passing, and C's to students she thought were probably failing.

75.    ACC also falsified grades in courses that were considered prerequisites for other courses to ensure students' progression to the subsequent courses.  For example, in or about 2009, students F.I. and L.I. took a course entitled "Anatomy and Physiology," a course that was a prerequisite for lab courses the following semester.  Anatomy and Physiology was taught by instructor Bridgette Gann.  F.I. and L.I. received failing grades from Gann; however Bares changed their grades to passing grades so that they could progress to the lab courses the following semester, ensuring ACC's continued receipt of Title IV funds for the students.

## VI.    CLAIMS FOR RELIEF

### A.    False Claims Act, 31 U.S.C. § 3729(a)(1)(A) – False Claims

76.    Plaintiffs re-allege and incorporate the allegations contained in the preceding paragraphs.

77.    Through the acts described above, Defendant, its agents, and employees knowingly presented and caused to be presented to the United States Government false and fraudulent claims for payment or approval in order to obtain federal student loan funding for students enrolled at ACC's campuses.

78.    The United States and its fiscal intermediaries, unaware of the falsity of the claims made or submitted by Defendant, its agents, and employees, paid and continue to pay ACC for

claims that would not have been paid had Defendant not submitted false and fraudulent claims for payment.

79.     The United States has sustained damages as a result of Defendant's false or fraudulent claims in an amount to be determined at trial.

### B.   False Claims Act, 31 U.S.C. § 3729(a)(1)(B) – False Statements

80.     Plaintiffs re-allege and incorporate the allegations contained in the preceding paragraphs.

81.     Through the acts described above, Defendant, through its agents and employees, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in order to obtain federal student loan funding for students enrolled at ACC's campuses.

82.     The United States and its fiscal intermediaries, unaware of the falsity of the records or statements that were material to false or fraudulent claims made or submitted by Defendant, its agents, and employees, paid and continue to pay ACC for claims that would not have been paid had Defendant not incorporated false records or statements into claims made or submitted by Defendant, its agents, and employees.

83.     The United States has sustained damages as a result of Defendant's use of false records or statements material to false or fraudulent claims.

### C.   False Claims Act, 31 U.S.C. § 3729(a)(1)(C) – Conspiracy

84.     Plaintiffs re-allege and incorporate the allegations contained in the preceding paragraphs.

85.     Through the acts described above, Defendant entered into a conspiracy or conspiracies with others to defraud the United States by getting false or fraudulent claims allowed or paid.

Defendant has also conspired to actively conceal facts, which, if known, would have reduced or eliminated government obligations and benefits to them.

86.     Texas Bank has taken substantial steps in furtherance of these conspiracies by providing the private loans that enabled ACC to falsify their 90/10 figure and ensure continued receipt of Title IV funds.

87.     The United States and its fiscal intermediaries were unaware of Defendant's conspiracies of the falsity of the records, statements and claims made by Defendant and its agents, employees, and co-conspirators. As a result, the United States Government has paid and continues to pay millions of dollars in Title IV funding to ACC.

### D.   False Claims Act, 31 U.S.C. § 3729(a)(1)(G) – Obligation to Pay

88.     Plaintiffs re-allege and incorporate the allegations contained in the preceding paragraphs.

89.     Through the acts described above, ACC knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the United States Government.

90.     The United States has sustained damages as a result of ACC's use of false records or statements material to an obligation to pay or transmit money or property to the United States Government, or by knowingly concealing, avoiding, or decreasing an obligation to pay or transmit money to the United States Government.

### E.   Fraud and Fraud in the Inducement – Against the United States

91.     Plaintiffs re-allege and incorporate the allegations contained in the preceding paragraphs.

ORIGINAL FALSE CLAIMS ACT COMPLAINT – PAGE 18

92.   ACC's misrepresentations and omissions to the United States Government were made intentionally, or made recklessly without any knowledge of their truth.   ACC made these misrepresentations and omissions with the intent that the United States government rely on them. ACC knew that the misrepresentations and omissions were material to the United State's decisions to enter into contracts with ACC and ACC's students.

93.   The United States Government relied on the material misrepresentations or omissions and has sustained damages in an amount to be determined at trial.

94.   The United States and its fiscal intermediaries, unaware of the falsity of the records, statements, and claims submitted by ACC, its agents, and employees, paid and continue to pay ACC for claims that would not have been paid had ACC not submitted false claims for payment.

## VII.   NOTICE TO THE UNITED STATES

95.   As required under the False Claims Act, 31 U.S.C. § 3730(a)(2), Relators, simultaneously with the filing of this Complaint, provided to the United States Attorney General a statement of all material evidence and information related to Relator's Original Complaint. This disclosure statement supports the existence of "submission of a knowingly false or fraudulent claim for payment or approval," under the False Claims Act, 31 U.S.C. § 3729(a)(1).

## VIII.   JURY DEMAND

96.   Plaintiff and Relators request a jury trial.

## IX.   PRAYER

WHEREFORE, Plaintiff and Relators pray that this Honorable Court enter judgment against Defendant as follows:

1.   That Defendant cease and desist from violating 31 U.S.C. § 3729 et seq.

2.   That Defendant is liable to Plaintiff in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's actions, as

well as a civil penalty against each Defendant of $10,000.00 - $50,000.00 for each violation of 31 U.S.C. § 3729;

3.   That the Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

4.   That the Relators be awarded all costs and expenses of this action including attorney's fees; and

5.   That the United States and Relators receive all such other relief as the Court deems just and proper.

Respectfully submitted,

LAW OFFICE OF JULIE JOHNSON, PLLC

By:_____

Julie E. Johnson
State Bar No. 10758900
Amanda Reichek
State Bar No. 24041762

3100 Monticello, Suite 500
Dallas, Texas 75205
(214) 265-7600
Fax: (214) 265-7626

**COUNSEL FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing complaint was served by United States mail, CMRRR, on the _27_ day of __July__, 2010, to each of the following:

Eric H. Holder, Jr.
US Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

U.S. Attorney for Fort Worth Division
J. Scott Hogan
Burnett Plaza, Suite 1700
801 Cherry Street, Unit #4
Fort Worth, TX 76102-6882

_____
Julie E. Johnson

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

United States of America, Plaintiff,
Shawn Clark and Juan A. Delgado, Qui Tam Relators

**DEFENDANTS**

American Commercial Colleges, Inc.

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed _____ Lubbock County
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Julie E. Johnson
Law Office of Julie Johnson, PLLC
3100 Monticello Ave., Suite 500
Dallas, TX 75205
214-265-7689        Fax: 214-265-7626

Attorneys (If Known)

RECEIVED
BY
JUL 28 2010
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEX

5-10CV1478-K

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

x 1  U.S. Government
      Plaintiff

☐ 2  U.S. Government
      Defendant

☐ 3  Federal Question
      (U.S. Government Not a Party)

☐ 4  Diversity
      (Indicate Citizenship of Parties
      in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
and One Box for Defendant)
(For Diversity Cases Only)

|  | DEF |  | DEF |
|---|---|---|---|
| Citizen of This State ☐ 1 ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State ☐ 2 ☐ 2 | Incorporated and Principal of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a ☐ 3 ☐ 3 Foreign Country | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| | | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | or Defendant) | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | Security Act | 26 USC 7609 | State Statutes |
| | | ☐ 550 Civil Rights | | | x 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

x 1 Original       ☐ 2 Removed from      ☐ 3 Remanded from      ☐ 4 Reinstated or   ☐ 5 Transferred from       ☐ 6 Multidistrict   ☐ 7 Appeal to District
    Proceeding          State Court            Appellate Court        Reopened         another district (specify)   Litigation        Judge from
                                                                                                                                        Magistrate
                                                                                                                                        Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)
False Claims action against the U.S. Government brought by Relators under 31 U.S.C. Sec. 3729, et seq.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  x Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE

DOCKET NUMBER

DATE 7/27/10

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**JULIE JOHNSON** PLLC

LAW OFFICE OF JULIE JOHNSON

OF COUNSEL:
DAVID BENFORD
AMANDA REICHEK

3100 MONTICELLO AVENUE, SUITE 500
DALLAS, TEXAS 75205
JULIE@JULIEJOHNSONLAW.COM

(214) 290-8001
FAX: (214) 265-7626
METRO: 1 (888) 416-9572

July 27, 2010

**FILING UNDER SEAL**



3 - 1 0 C V 1 4 7 8 - K

US District Clerk
Northern District, Dallas Division
1100 Commerce, Room 1452
Dallas, TX 75242

RE:   United States of America, Plaintiff and Shawn Clark and Juan A. Delgado, Qui
      Tam Relators, v. American Commercial Colleges, Inc.
      Our File No.: 6060/00

Dear Clerk:

Please find enclosed for filing, **under seal pursuant to Title 31 § 3730 (False Claims
Act) per Local Rule 79.3,** the following in connection with the above captioned matter:

1. Original and 2 copies of the False Claims Complaint;
2. Original and 2 copies of the Civil Cover Sheet;
3. Original and 2 copies of Plaintiffs' Certificate of Interested Persons;

Also enclosed is our firm check in the amount of $350.00.  Please return file marked
copies to me via the courier.

Sincerely,

Julie E. Johnson

JEJ/pp
encls.
cc:   Eric H. Holder, Jr., U.S. Attorney General, via CMRRR 7010 0290 0001 5168 3586
      Scott Hogan, US Attorney – Fort Worth Division, via CMRRR 7010 0290 0001 5168
      4019